Leo M. Waldor, complainant,

*v.*

Joseph F. Bruey, individually and trading as Federal Tool and Machine Co., defendant.

[Decided September 10th, 1946.]

*Messrs. Ruback & Albach (Mr. Meyer E. Ruback,* appearing), for the complainant.

*Mr. Meyer E. Ruback,* for the receiver.

*Messrs. Kalisch & Kalisch (Mr. Isidor Kalisch,* appearing), for the defendant.

STEIN, V. C.

The final decree in this cause was advised by me on April 18th, 1946, after I had considered the special master's report filed with me the preceding November, had read and analyzed the proofs and exhibits, which amount approximately to 2,000 pages, and had by order overruled the exceptions filed by both sides and had confirmed the master's report. By my letter of April 8th, 1946, I informed counsel for the parties that not alone were the findings of the special master abundantly supported by the proofs but that upon an independent analysis of those proofs I reached the same result as the master. I thereupon confirmed the master's report in its entirety and the final decree followed shortly thereafter. Pursuant to my request, expressed in that letter, counsel have informed me that the defendant, Bruey, has appealed from the order overruling his exceptions to the master's report and from the said final decree. Appellant's counsel has transmitted to me the printed state of the case on appeal so that any references I might wish to make to the testimony could be made by page number in the printed record, thus avoiding page references to the typewritten transcript, which would result in confusion.

There is another appeal pending between the parties concerning which this court has already spoken. 138 *N. J. Eq.* 76; 46 *Atl. Rep.* (*2d*) 802. It relates to the defendant's appeal from my order allowing the special master compensation for his labors in the cause. On that subject my order appears at page 279 and my memorandum on that subject appears at page 270.

The bill was by one partner against the other and it sought, amongst other things, that the defendant, Bruey, be compelled to account for partnership funds misappropriated by the latter, that he be restrained from commingling partnership funds with his own and from denying complainant access to the books, accounts and records of the partnership, that the defendant make discovery of partnership transactions carried on by the defendant in his own name, and that a receiver be appointed to conserve the partnership funds, assets and business, with power to continue the operation of that business and with further power to take action to compel the defendant

to respond to the partnership fund for moneys due it from the defendant.

It appeared to me from a reading of the bill and the supporting proofs that at the time this suit was commenced the co-partnership in which complainant and defendant were equal partners was in a very precarious situation, that the business and property of the firm were within the complete domination of the defendant to the exclusion of his partner, and that the partnership funds were in the process of being looted by the defendant. Accordingly, on September 5th, 1944, I appointed a custodial receiver and imposed upon the defendant certain imperative restraints, one being to the effect that he should not withdraw or attempt to withdraw any of the funds of the co-partnership on deposit to its credit in any bank or banks (page 53). Until then only the defendant could sign firm checks. My order further provided that such funds on deposit to the credit of the firm be withdrawn in the co-partnership name by checks to be signed only by the custodial receiver. The receiver qualified the same day. The defendant admitted on cross-examination that late in the afternoon of September 5th, 1944 (the day the receiver was appointed), he received at his home at Brielle a telephone call from his office informing him that the receiver was at the plant taking possession. The plant was in Newark. The next morning, at 9 o'clock, the defendant, Bruey, went to the banking house of the United States Trust Company, where the firm had its funds on deposit, and cashed the firm's check for $8,000. That was about all the money that the firm had. Bruey admitted that this was the first time that he had ever gone to the bank as early as 9 o'clock to cash a check (pages 1497, 1498). The defendant returned the money later that day under the following circumstances:

The receiver appeared before me at eleven o'clock that morning and reported that while he had been sitting in the bank's front office, presenting his credentials and having the partnership funds transferred to his name as custodial receiver, the defendant, Bruey, had walked in at nine o'clock, through a side entrance, and had obtained from a paying teller about all the cash that the firm had, namely $8,000, that in the meantime the officer in the front of the bank, not

knowing of that withdrawal, had issued to the receiver a bank book with a credit for all the funds not yet known to have been so withdrawn, and that the bank had discovered the situation an hour later. I directed the receiver to make immediate demand for the return of the money and that if it were not returned by three o'clock that day, he, the receiver, should, in conjunction with the bank's officers, present the matter immediately to the Prosecutor and also present the matter to me by petition so as to inaugurate proceedings in criminal contempt. Such demand was made, and upon the advice of his counsel the defendant before three o'clock that day returned the withdrawn funds. This occurrence very clearly showed me that the partnership estate required protective measures and that the custodial reeciver had been appointed none too soon.

The order of appointment contained the customary show cause feature. Upon return of that order, complainant's counsel appeared and informed the court that the defendant was represented by Mr. Andrew B. Crummy and that the latter had said that there would be no opposition to the continuance of the receiver already appointed. Later that day complainant's counsel appeared before me with Mr. Crummy and, without objection, took the order continuing the receiver and converting it from a custodial receivership into that of an equity receivership over the business, assets and property of the co-partnership. Upon the receiver's petition I thereafter appointed Meyer E. Ruback, complainant's solicitor, as counsel to the receiver.

Thereafter, when the cause was at issue and referred to me, Mr. Ruback and the defendant's then counsel, Mr. Crummy, appeared before me and informed me that most of the subjects in dispute between the parties were matters of involved accounting, that the hearings would consume many weeks, if not months, and that the matter should be referred to a special master skilled in accounting intricacies, with a power in the master not alone to report but also to find the disputed facts. Accordingly, I made the reference to Mr. John J. Clancy. To the order of reference the defendant's solicitor appended his consent (pages 106-108). Counsel's prediction of the time required for the hearings was not extravagant.

witness the record in this case. The master's report helped me greatly. It assembled in orderly array all the factual issues and showed skill in matters of accounting and painstaking attention to details. The testimony and exhibits convinced me, as they did the master, and quite apart from his report I reached the same results. However, that report furnishes the advantage that in treating with the items in dispute I shall be able to do so with broader sweep than if it were not a part of the record.

The master's report deals with thirteen main subjects, twelve of which are identified and summarized in schedule "A" attached to the report (page 259). The thirteenth subject, namely, that of the respective shares and participating interests of the parties in the co-partnership, is presented by section I of the report (pages 194-203). I do not consider it necessary to discuss in detail in this opinion any of the subjects disposed of by the master's report other than the one dealing with the shares and participating rights of the partners, the one dealing with the dispute over the price charged by Bruey for secondary work, and the one involving the credit allowed Bruey for the use of a machine owned by him and loaned to the partnership.

### THE SHARES OF THE PARTNERS.

The defendant, Bruey, has for many years been in the business of making tools for machines. That business he has conducted under the trade name of "Federal Tool and Machine Co." and he is the sole owner of that enterprise. Complainant never had any interest or share therein. In August of 1943 Bruey and the complainant, Waldor, formed the co-partnership involved in this litigation. The stated purpose was to manufacture screw machine products. On August 4th, 1942, the two men signed and swore to a certificate, filed in the Essex County clerk's office, stating that they would engage in business as partners under the name of "Federal Screw Machine Products Co." (page 27). As is usual in certificates of that character, there is no reference to the partnership shares. At about the time this certificate was filed a three year lease was obtained by the firm for a plant on Mitchell Place, in the City of Newark. That lease

was signed by both Bruey and Waldor, both of whom personally obligated themselves for the payment of the rent and the performance of the other requirements of the letting. Possession of that plant was taken at once by the partners and the firm conducted its operations there at all times, down to V-J Day, when it virtually discontinued all further business activity. Actual possession of the plant was surrendered by the receiver to the landlord about four or five months ago.

At about the time that the firm was organized the partners sought to bring into the firm three additional men: Messrs. Bertelo, Parrillo and Osmun. These men entered the firm in September of 1943, when articles of co-partnership were prepared and signed by the five partners. That agreement contains the following provision:

"**3.** The partners shall be entitled to the capital and property and income of the partnership, the good will of the business, in the following shares and percentage as follows:

| | |
|---|---|
| Joseph F. Bruey | 33¾% |
| Leo M. Waldor | 33¾% |
| Richard V. Osmun | 12½% |
| Frank Bertelo | 10% |
| Frank Parrillo | 10%" |

It is clear from the foregoing facts that what had been an equal partnership between Bruey and Waldor before the firm was enlarged remained as between the two an equal partnership after the firm expanded. Initially complainant and defendant each had a half interest. In order to admit the three new men, complainant and defendant each reduced his respective holding by 16¼%, to make up the 32½% allocated in the aggregate to Osmun, Bertelo and Parrillo. That left 67½% to be divided between Bruey and Waldor. It was equally divided, each keeping for himself 33¾%, as indicated in the foregoing schedule of new holdings. (Page 18.)

The new five-man firm lasted but a few months. Dissension developed and Osmun, Bertelo and Parrillo sought relief in Chancery. The court appointed a receiver, who served a few months and until the dispute between the partners was settled amongst themselves. The bill was thereupon dismissed and the receiver discharged. The settlement which terminated that litigation was put into a formal agreement

dated January 25th, 1944, by which Bruey and Waldor together bought out the shares and interests of Osmun, Bertelo and Parrillo. By that agreement (page 29) Osmun, Bertelo and Parrillo (there called the "withdrawing partners") expressly released Bruey and Waldor (there called the "continuing partners") from all claims and accountings. The withdrawing partners assigned and released unto the continuing partners the former's percentage, share and interest in the business of the partnership and in its property, assets, credits, effects and good-will. The assignment to Bruey and Waldor was to them and "their heirs and assigns absolutely." For this acquisition of the interests of the three withdrawing partners the two continuing partners jointly paid the sum of $12,000 by executing a series of twelve promissory notes signed by Waldor and Bruey jointly. These notes are tabulated at page 32 of the record. Each month one of the notes was paid with the partnership funds and it is admitted by the defendant that the entire $12,000, represented by those notes, was paid out of the partnership treasury. Again it should be noted that the payment of those notes was collaterally secured by a chattel mortgage given by the partnership to the retiring partners and encumbering a machine owned by the parnership. It might also be noted that by the same agreement of settlement Bruey and Waldor personally assumed the payment of all the debts of the co-partnership. There were no other written agreements between the parties. In the documents already referred to there is not the slightest hint of any contemplated inequality of interest or participation as between the complainant, Waldor, and the defendant, Bruey. By those documents it is demonstrated that these two men have at all times been, in relation to each other, equal partners. Before Osmun, Bertelo and Parrillo were admitted to the firm Waldor and Bruey were for a month or so equal partners, each having a one-half share. The admission of the three new partners created new percentages but still left complainant and defendant each possessed of like participation, viz., $33\frac{3}{4}\%$. The expansion of the firm affected Waldor and Bruey in precisely the same measure of contraction or diminution. Thereafter the contraction of the firm (in respect of the number of partners)

affected Waldor and Bruey in precisely the same measure of expansion of interest. The interest of each was restored to that of 50%. Complainant testified that after he and the defendant bought out the shares of the retiring partners there was no written or oral agreement between them fixing and establishing any new ratio of holding between the two men (page 323). This is confirmed by the answer of the defendant (page 59) in which, speaking of the five-man partnership, the defendant says: "The only interest that the complainant had in any partnership was 33¾ interest in the original partnership and there was no change in these arrangements after the dissolution of the partnership mentioned in the bill of complaint." To the same effect is the defendant's statement in his affidavit, attached to his answer. By what right the defendant, Bruey, attempts to usurp unto himself all the shares purchased by him and Waldor jointly and with their joint funds and joint liabilities, the master could not perceive. Nor can I. The 32½% interest acquired from the three withdrawing partners accrued equally to the two remaining partners, who equally paid for the acquisition. Bruey can no more claim the whole of it than could Waldor, and yet Bruey makes that claim by his answer. But there is more to it than what has already been said. Twice thereafter Bruey altered his story. He claimed that the night before the settlement agreement (*Exhibit C, p. 29*) was made, by which the interests of the retiring partners were acquired, he and Waldor came to an oral agreement that Bruey was to have 75% and Waldor the remaining 25%. In other words, the essence of his claim was that Waldor's existing interest of 33¾% was to be reduced to 25% while Bruey's existing 33¾% was to be increased by two accretions, viz.: (a) Waldor's surrender of 8¾% and (b) the interests of the three retiring partners amounting to 32½%, thus adding to Bruey's already existing interest a total of 41¼% and bringing his holding up to 75%. This claim was not alone denied by the complainant but is negated by the defendant's answer, in which it is stated that "the only interest that the complainant had in any partnership is 33¾% in the original partnership and there was no change in these arrangements after the dissolution of the partnership men-

tioned in the bill of complaint. After the dissolution of the partnership mentioned in the bill of complaint, the complainant still had 33¾% interest in said partnership" (page 59). The defendant said the same thing in his affidavit (page 68). Obviously, if "there was no change in these arrangements" which originally gave complainant 33¾%, then the alleged 75%-25% arrangement never took place. The master didn't believe Bruey on this point. Nor do I.

To support the alleged 25%-75% oral arrangement, the defendant called as his witness a Miss Majewski, whom the defendant visited at her home in Passaic and who later and at the time of the hearing was living in the defendant's home at Brielle as his housekeeper. She testified that sometime in January or February of 1944 and before the three other partners withdrew both Bruey and Waldor were at her home in Passaic and were discussing their shares in the partnership while having dinner with her, and that Bruey asked Waldor, "What about your share in the partnership?" and Waldor answered, "Why, it is the same as it was before" (page 1105). This statement the witness expanded so as to attribute to the complainant the assertion that their shares were to be "the same as it was before, one-third, and two-thirds for you." She testified that Bruey objected to that proposal and countered by saying that he, Bruey, was to have three-fourths and Waldor one-fourth and that thereupon Waldor without any further ado reached over the table, shook hands with Bruey, and said, "O. K." The witness testified that that was the only occasion when any business was ever discussed in her presence by the partners and that she recalled it to Mr. Bruey for the first time in the office of Mr. Bruey's lawyer about three or four weeks before the day she gave her testimony, and that previous to that day she had not discussed it with Mr. Bruey. The master refused to accept her story. Nor can I believe it. For over two years she had no occasion to recall the alleged incident or to mention it to Mr. Bruey but she does recall it to his mind at his lawyer's office while the hearings are in progress. No explanation is furnished for having brought her to the office of Bruey's attorney in advance of her having recalled and revealed the alleged conversation and she testified on no other material point. I

cannot attribute to Mr. Bruey or his counsel any occult powers of divination. To me it appears that her story was a studied one, but not well studied, for in her statement of what she heard complainant say was the assertion of a nonexistent fact, one that Bruey himself promptly repudiated. She says complainant wanted the shares to be "the same as it was before, one-third and two-thirds." The fact is that no such ratio had ever theretofore existed between these two partners and on his cross-examination the defendant denied Miss Majewski's story that Waldor had wanted that their respective interests be one-third and two-thirds "as before" (page 1469). When pressed to explain the conflict between this earlier arrangement of a 25%-75% ratio and the later statements in his answer and affidavit that the complainant had a $33\frac{3}{4}\%$ interest, his answer was that the one was oral and the other written. The defendant seems to have occupied a position which he wished at all times to maintain in a fluid state, claiming at one time a $66\frac{1}{4}\%$ interest, at another time an even 2/3 interest, and finally a 75% interest. At another time he claimed that before the five-man partnership agreement was drawn he and Waldor had agreed that Bruey was to have 51% and Waldor was to have only $16\frac{1}{2}\%$, and that he, Bruey, had instructed his attorney so to provide in the partnership agreement. Yet the agreement which Bruey subsequently signed gave him and Waldor the like interest in the five-man partnership, viz., $33\frac{3}{4}\%$ to each. True, Bruey subsequently had his attorney prepare a power of attorney by which Bruey would have had the power to act for $17\frac{1}{4}\%$ of Waldor's share, thus lifting Bruey's power (not ownership) to 51%. Waldor refused to sign this proffered power of attorney, but the fact that it was submitted for his signature is significant. If Bruey at any time had more than a 50% interest in the partnership, what need was there for him to seek a power of attorney which would lift his power to 51%? Definitely, Bruey did not consider himself entitled at any time during the five-man partnership to any interest greater than $33\frac{3}{4}\%$, or thereafter to any interest greater than 50%. That Bruey informed other persons that he and Waldor were equal partners is confirmed by the testimony of the witness Collito and by Mr. Fairchild, the repre-

sentative of the Packard Motor Car Company, both wholly without interest in the controversy.

I regard the defendant's claim of any interest greater than 50% as sham and as an attempted fraud upon his partner. The claim is wholly without support in the signed documents, in the proffered power of attorney, and in the attendant circumstances. Quite the contrary. All of these, including the testimony of disinterested witnesses of unimpeachable credibility, riveted the fact that the interests of these two men were always equal. The defendant's attempt to overreach on the matter of his share in the business is quite in line with his actual overreaching in the matter of the prices that he personally charged the firm for secondary work done by him for the firm. With that complaint I now deal.

### OVERCHARGE BY DEFENDANT FOR SECONDARY WORK.

Paragraph 18 of the contract between the five partners provided that all secondary operations or tool work or machine shop work which would not be performed by the co-partnership should be sub-contracted exclusively to the Federal Tool and Machine Co. That is the trade name under which the defendant was conducting his own private tool business in a plant on Orchard Street, in the City of Newark. The contract recited that this provision in favor of the Federal Tool Company should run with the co-partnership. Assuming that the stated provision survived the dissolution of the five-man partnership and was carried over to the continuing partners in their new relationship, this can mean only, as claimed by the defendant, that Bruey was given a pre-emptive right to do such secondary work as the firm could not or would not itself perform. That claim was not disputed either by the complainant or the equity receiver in this cause. It will be noted, however, that nothing in that agreement or in any other document between the parties fixed the price at which the defendant was to charge the firm for such secondary work. In the absence of any express stipulation fixing such price, it would naturally follow that the charge would have to be a reasonable one and one consistent with prices charged by others for the like work per-

formed in the same general area. The bill of complaint charges that considerable secondary work was done by the defendant under an express mutual agreement that such work was to be charged at the "fair market value" thereof. The defendant's answer (page 61) denies any express agreement concerning price but says that "it was agreed that 'Tool' was to make a reasonable charge for the work done by 'Tool.'" The word "Tool" stands for Federal Tool & Machine Co., the trade name or style under which the defendant personally conducted his own separate business. The defendant's answer also states that the defendant did not receive any large or "unreasonable" compensation for the secondary work done for the firm. The defendant's affidavit, attached to the answer, reiterates the agreement that the charges were to be "reasonable," and that the defendant had not received "unreasonable" compensation for the work done for the firm. Were this all that had to be considered on the subject of the price to be charged by the defendant, the effort would be limited to determining the reasonable and fair market value of the defendant's performance. Complainant, however, proved an express agreement by which the defendant undertook to do the work at 7½c per fuse housing. As will be presently shown, this unit price was higher than the unit price at which the like work was obtainable at the same time and in the same area from other competent concerns engaged in doing such work. The defendant denied making the agreement to do the work at 7½c per unit and claimed that he was entitled reasonably to 10¼c per unit. The master having found from the evidence that the same work could be had in the open market for as little as 5c per unit, was constrained to allow the defendant to charge 7½c per unit, and this because of the complainant's own testimony that the stipulated price was 7½c. Bearing in mind that it was the complainant himself who proved a market price of 5c per unit, his claim of an express agreement at 7½c per unit is entirely credible. Because of this circumstance and other circumstances brought out by the evidence, the master rejected the defendant's denial of a stipulated price of 7½c, and I concur in that action. Were it not for the fact of the agreed price—a fact voluntarily and candidly brought out

by the complainant himself—the reasonable charge allowable to the defendant would have been under 7½c and probably at the figure of 5c per unit. These variances translate themselves into very substantial sums of money when applied to the huge quantities of fuse housings upon which secondary work was performed, initially for the firm and thereafter for the equity receiver in this cause. It should be remembered that the primary work on the fuse housings was performed by the firm and that on a very considerable number of fuse housings the secondary work was performed by the defendant in his own private business. Until February of 1944 the secondary work being done by Bruey was made up of six separate operations. The major two of these operations consisted of (1) boring a hollow mill and (2) boring a large counter-bore. These two operations alone constituted about 50% of the required secondary work undertaken by the defendant. Under the first contract which the firm obtained, it received for its primary work 12c per unit. Under a subsequent contract the price for both primary and secondary work was fixed at 24c per unit to be paid by the customer, of which the firm received 12c for the primary work and the defendant received 12c for his secondary work, the latter still consisting of six operations. On a later contract with the Unexcelled Manufacturing Company the price for the entire job was fixed at 23c per unit, and by agreement between the complainant and the defendant the firm was to receive 12c for the primary work and the defendant was to receive 11c for his secondary work, still consisting of the six operations.

The defendant was not able to perform the aforementioned two major operations in an efficient manner and there was a tremendous number of rejections. The fuse housings were used for military purposes and required precision performance. By February, 1944, it became evident that the defendant was unable to do a job acceptable to the customers who, in turn, were subject to strict military check-up on the quality of the work. Therefore, by the agreement of the parties, the division of work between the firm and the defendant was substantially altered. The firm took over the two major operations, which had constituted about 50% of

the defendant's secondary work, leaving four minor operations to be performed by the defendant. This change, of course, imposed on the firm increased costs of labor, overhead and other expense of production. Upon the change going into effect, the firm naturally became entitled to a higher price for its primary work, thusly enlarged by the two major secondary operations, and by the same token the defendant's price required corresponding reduction or abatement. Nonetheless, over the continued protests of Waldor, the defendant persisted in charging for the four remaining secondary operations the same price which he had theretofore charged for all six operations. If 12c was a fair price for the six operations, then the elimination of the two major operations constituting 50% of the entire secondary job should have resulted in the defendant's being entitled to receive 6c per unit. The defendant denies the proof of complainant and his expert witnesses that the two transferred operations constituted 50% of the secondary work, and he insists that they constituted but one-third of the secondary work. Even if this were so, Bruey's charge could not reasonably be more than two-thirds of the original charge of 12c, namely, 8c per unit. Bruey, however, arbitrarily fixed upon 10¼c as the charge for the remaining four operations and he has stuck to that claim throughout this litigation despite the great amount of proof from disinterested persons fixing the reasonable price as ranging from 7½c down to 5c per unit.

At this point it is important to note that throughout the life of the firm, from its organization down to the date I appointed the custodial receiver, checks against firm funds in bank were signed by Bruey alone. It is not disputed that the complainant, Waldor, never signed a single check against firm deposits. The power to draw funds was reposed exclusively in Bruey. All the bookkeeping details were handled from Bruey's own office, where the books and records were kept, and with few exceptions all collections on the firm's contracts cleared through Bruey's office and through his own bank account. He would receive collections and make disbursements through his own account, but would also retain for himself, for his secondary work, consisting of four operations, moneys at the rate of 10¼c per unit. This led in the

beginning to considerable strife between the partners. Complainant insisted that Bruey charge only 7c per unit. Bruey finally said he wanted 8c per unit. They both consulted a Mr. Fairchild, who was the material expert and expediter of the Packard Motor Car Company, for which the firm was performing primary and secondary work on fuse housings. Fairchild made some inquiries and found a concern in North Bergen, New Jersey, which offered to do the secondary work for 5c a unit. Fairchild reported this to the two partners and told them that they ought to compromise their dispute by splitting the difference and establishing 7½c as the fixed price. He even suggested to Bruey that the latter could sub-contract the work to that other concern and could make a turnover profit of 2½c per unit. The two partners thereupon agreed on 7½c per fuse housing.

When the receiver was appointed herein he was informed of the agreement between the partners that the price to be charged by Bruey was 7½c per unit. He also ascertained that Bruey was retaining firm funds at the rate of 10¼c per unit. He made inquiries in the market and received an offer from the Cooper Engineering Company of Chatham, New Jersey, to do the like work at 7½c per unit. The receiver experimented with some housings, had some sample work done by the Cooper Company, and that work was approved and accepted by the firm's customers. The Cooper Engineering Company offered to take on any quantity of housings at the unit price of 7½c. These facts were made known by the receiver to the defendant and the receiver expressed his unwillingness to allow 10¼c for work that could be obtained in the open market at 7½c. Bruey refused to agree to do the work for the receiver at the lower figure and insisted that under his contract he was entitled to receive all the secondary work and that he, Bruey, alone could fix the price. So he interpreted his contract. In the meantime and pending this dispute, Bruey continued to receive collections from the firm's customers, and before long he was indebted to the receiver for approximately $33,000, representing the differential in unit charges. Thereupon the receiver exhibited his petition to me, presenting the facts and expressing his wish to award to others the secondary work required by the firm, and seeking the court's instructions. I allowed an order to

show cause returnable December 10th, 1944. I heard the matter on February 20th, 1945, at my chambers in Elizabeth. There were present the receiver, his counsel, and Bruey's counsel, Mr. Crummy. There was laid before me the contract under which the defendant claimed the right to the secondary work. There was also exhibited to me the offer of the Cooper Engineering Company to do the like work for 7½c per unit. I was also advised by the receiver that pending contracts called for hundreds of thousands of fuse housings and that more contracts were in the offing. I told defendant's counsel that the receiver would not be justified in awarding the work to Bruey at the larger figure in the face of the lower offer. It was apparent to me that what Bruey was doing was overcharging the firm in which he only had a half interest and favoring his own private business, in which he had a 100% interest. The injury to the complainant was apparent, and without formal order I then and there instructed the receiver to continue to give the work to Bruey only if he would perform at 7½c per unit. Mr. Crummy stated that his client would accept those conditions. Immediately following that conference a stipulation on the price was submitted to Mr. Bruey and he declined to sign it. Thereupon the receiver promptly awarded all the future secondary work to the Cooper Engineering Company at 7½c per fuse housing. At the hearings Cooper testified that that was a fair and reasonable price in February of 1944 and at all times thereafter and that he made a very good profit at 7½c, notwithstanding the fact that his labor scale in Chatham was higher than that obtaining in the City of Newark. Cooper's work proved to be most satisfactory. He did for the receiver approximately 300,000 fuse housings, of which less than 1% was rejected by the inspecting authorities.

Besides Cooper several experts testified on the reasonable value of the four operations constituting Bruey's secondary work. As already stated, Fairchild obtained a bid of 5c per unit, and this from the Paradis Machines of North Bergen. The expert Powell fixed the value of the work at about 6c per unit. The defendant produced one witness, Canning, whose qualifications are not impressive. He stated his opinion that a fair price for the work would have been 8 to 9c per unit.

I think that in allowing Bruey a charge of 7½c per unit he is being dealt with very generously. The complainant acceded to this only because that was the price expressly stipulated. If we pass from that express agreement into an inquiry of reasonable value, the highest that could possibly be awarded to Bruey would be the 7½c at which the Cooper Engineering Company produced for the receiver this very unit by the thousands with the most satisfactory results. The lowest would be 5c per unit for which the Paradis Company offered to perform. Bruey's attempt to retain out of the moneys collected by him an excess of 2¾c per unit is not alone an act of overreaching against his partner but an act of positive aggression. He had his hands on the firm's funds, he made the allocations as between himself and his firm, and he simply took and retained what he wanted. For the difference representing the amount of overcharge he was held to account. It was proved that labor costs and other conditions were the same during the period preceding the appointment of the receiver and the period following such appointment. The charge for both periods must therefore be uniform, namely, 7½c per unit. What is a fair charge to the receiver constitutes a fair charge to the firm for the period immediately preceding the receivership. These overcharges translate themselves into the figures furnished by the master in his summary (page 259) under the heading of "Price Adjustment." They amount to $36,261.33 as between the firm and the defendant and to $39,002.28 (this inclusive of some other items) as between the defendant and the receiver.

One more thing need be said on this subject. It was argued for the defendant that because paragraph 16 of the partnership agreement (page 24) names Bruey the executive manager of the co-partnership and the partners "agree that the said Joseph F. Bruey shall have full and complete authority in all matters of policy and in the conduct of the business of the co-partnership," he was the final arbiter as to what constituted a reasonable price to be charged by him personally for the secondary work done by him for the partnership. This argument is spurious. The authority so conferred by the agreement does not and cannot capacitate the defendant to accomplish a fraud on his partner. If the "authority in all matters of policy" conferred by the agreement upon Bruey

were unfettered by the rule of reason and fairness, Bruey would have been placed in a position where he could have fixed any price for himself to the deprivation of the firm of all profit resulting from the enterprise. Such result could hardly have been in the contemplation of the parties to the partnership agreement. It seems to me, as the master pointed out in his report, that Bruey's position was one in which he should have been meticulously and scrupulously careful not to favor his private purse at the expense of the co-partnership. I agree with the master that in relation to his partner, Waldor, the defendant was in a fiduciary position and that it was his duty to hold the scales fairly and honestly balanced between self-interest and fiduciary responsibility. Instead of doing that, he feathered his own nest to the extent of more than $83,000 of firm money. Half of that was money belonging to his partner.

The accounting on secondary work was voluminous and intricate but it proceeded on a uniform allowance to Bruey of 7½c per fuse housing. The application of that price to the various transactions is given in the testimony and in the accountant's schedules. They need not be here repeated. The result is mathematically unquestionable and I fully concur in all the reasons stated by the master in reaching the result that he did on this subject.

### RENT DUE FROM FIRM FOR GRIDLEY MACHINE.

Bruey personally purchased a machine and obligated himself to pay therefore $20,670.11. At the time of the hearings he had paid several instalments. He rented that machine to the partnership on or about September 16th, 1944. It was used by the firm until August 18th, 1945, when, immediately after V-J Day, the receiver terminated the rental arrangement and notified Bruey to remove the machine. It was thereafter removed. The period of use by the firm was eleven months and for it Bruey demanded a rental at the rate of 36% a year, based on the cost of the machine. His demand amounted to over $6,800 and he claimed that he was entitled to that because that was the ceiling price fixed by the O.P.A. on rental of machinery. As against this claim the testimony satisfied me that the following occurred: Bruey bought the machine under an arrangement made with his

partner that he was to buy it personally; that the firm would then make application to the Smaller War Plants Corporation for a lend-lease arrangement; that if that arrangement could not be obtained either by the firm or by Bruey personally, then Bruey would personally pay for the machine and would furnish its use to the firm on terms identical with those which would have constituted a lend-lease arrangement with the government agency. Those terms were that the firm would pay Bruey a monthly charge of $1\frac{1}{2}\%$, to be computed on the purchase price, and that that rental would be for the period commencing with the failure to obtain the lend-lease arrangement with the government. A lend-lease arrangement with the firm was refused by the government on September 16th, 1944, for the reason that the instant receivership was already in effect. Bruey then tried personally to obtain such an arrangement with the government but did not succeed. These facts were before me when an effort was made by Bruey to wrest the machine from the custody of the receiver. Had he succeeded at the time, it would have had a very disastrous effect on the firm's then pending contracts. I refused to allow the removal of the machine. However, the same facts were re-established before the master and I think he correctly decided that under the arrangement between the partners all that Bruey was entitled to was a rental of $1\frac{1}{2}\%$ per month for the eleven months that the machine was used. Particularly is this a fair recompense to Bruey when it is considered that under the ordinary lend-lease arrangement with the government the lessee paid a monthly rental of $1\frac{1}{2}\%$, which after five and a half years not only discharged the rental but also satisfied the purchase price of the machine in full and gave a final and absolute title to the lend-lessee. The $1\frac{1}{2}\%$ per month which the government charged embraced not alone rental or interest but also amortization of the purchase price. The complainant and the receiver stand on the agreement that the partners made and I see no reason why in good conscience Bruey should be permitted to repudiate his agreement and to enforce a usurious rate of 36% per annum. His demand not only offends the rule of fair dealing between partners but also violates his express contract to charge his firm the stipulated $1\frac{1}{2}\%$ per month. Here again I refused to allow Bruey to

overreach by charging 36% a year in the face of his promise to take 18% a year. The master was right and I concur in his conclusion.

I do not consider it necessary to discuss the many other subjects disposed of by the master's report and my confirmation of it. On each of those subjects I adopt the master's reasoning, opinion, finding and report. I wish to add nothing to them. There is, however, one matter unimportant in amount but significant in its implications. That relates to section XV of the master's report (page 240) and deals with the subject of the sale of scrap. The matter was first mentioned in the bill and presents the charge that Bruey sold metal scrap, the property of the firm, and retained for himself the $700 realized from that sale. Somewhere near the end of 1943, while the first receivership was in effect, Bruey surreptitiously disposed of scrap belonging to the partnership, collected $700 therefor and withheld the fact and the money from the then functioning receiver. The partners quarreled over this conduct, Waldor insisting that the $700 be turned over to the receiver. Bruey refused. But the matter soon came to an end when the receivership litigation was settled and the receiver was discharged. Waldor then asked Bruey either to deposit the $700 to the firm's bank account or to pay him, Waldor, his half of the money. Bruey said that he had the money in the safe and he kept stalling on the thing with the ultimate result that he never accounted for the money either to the firm or to his co-partner. In his answer (page 63) Bruey admits that he sold the scrap, but says that it was only for the sum of $627 and that the complainant sold scrap for $130, making a total of $757; that the money was put in an envelope and was disbursed for or on behalf of the partnership. The answer asserts that the defendant has in his possession receipts showing the disbursement of the moneys and that many of such receipts are made out in the handwriting of the complainant. The defendant said the same thing under oath when he made the affidavit (page 71) attached to his answer. Curiously enough, the defendant failed to substantiate these statements at any time during the prolonged hearings, and at no time produced a single receipt "made out in the handwriting of the complainant," or in anybody's handwriting, which would account

for these abstracted funds. I do not believe the explanation furnished in the defendant's answer and affidavit. It failed of proof and the pilfering of this amount, though small, is just another instance of the defendant's arbitrarily pocketing firm money just because he considered himself the "boss," felt that he dominated his partner and believed that he could get away with it. This is but one of the many instances where Bruey used partnership moneys for his own use. One need only examine the many small items conceded on the record by Bruey as proper charges against himself to perceive that he drew very little distinction in his mind between what was his own and what belonged to the firm, of which he was but a member.

In the posture in which this firm stood when the receiver was appointed, its doom was but a matter of time. It owed large sums to creditors and had only $8,000 in the bank, which was the money Bruey cleaned out the morning after the receiver was appointed. The receiver took hold of the business and from that moment it ran efficiently and prosperously. All the creditors were paid off in full. At the present time the firm is without creditors. In less than six months the receiver made a profit of $114,867.09, against which he charged for depreciation of machinery the sum of $13,333.52, leaving a true net profit of $101,533.57. He made considerable profit thereafter until operations stopped on V-J Day. After allowances heretofore made to the receiver and his counsel by orders from which no appeal was ever taken, the receiver has in hand at the present time over $128,000 in cash. Because of that balance and because there are no creditors, I deemed it unnecessary to compel the defendant to pay to the receiver the amount of $83,373.50, due from the defendant to the firm and its receiver. I considered it expedient to avoid the circuity of payment by the defendant of 100% of his indebtedness and then his taking back from the receiver, on final accounting, one-half of such payment. By my decree (page 294) I made the defendant answerable directly to the complainant for one-half of the indebtedness so due, that half amounting to $41,686.75, and for that amount allowed execution against the defendant's property, including his one-half interest in the fund in the hands of the receiver.